Filed 12/2/15  Hurtado v. Ishinabe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JAIME HURTADO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MASAKO ANNE ISHINABE,<br><br>    Defendant and Appellant. | D066573<br><br><br><br>(Super. Ct. No. D548584) |


APPEAL from an order of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed.


Law Offices of Beatrice L. Snider and Edward Castro for Defendant and Appellant.

Arizmendi Law Firm and Ruben F. Arizmendi for Plaintiff and Respondent.

Appellant Anne Ishinabe appeals an order denying her request for a domestic violence restraining order against respondent Jaime Hurtado.  Ishinabe and Hurtado lived together for about 14 years.  They had two children together, twins, born in April 2010.

Before Ishinabe filed her request for a restraining order, Hurtado had filed a petition for dissolution of marriage, which he later dismissed in lieu of a petition to establish parental relationship. In the latter petition, Hurtado sought visitation, physical custody and joint legal custody of the twins and requested mediation to establish a parenting plan.

According to Ishinabe, a day or two after Hurtado moved out of the family home he began stalking her and the children over about a two-week period. Ishinabe alleged Hurtado unexpectedly showed up both at the twins' preschool, when she was dropping them off, and at church. Ishinabe on May 16, 2014 filed a request for a restraining order under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.).[1]

The trial court, after hearing the testimony of the parties, considering their declarations in support of and in opposition to the request for restraining order and the argument of counsel, denied Ishinabe's request for a permanent restraining order. In so doing, the court found among things that Ishinabe was "less than credible" and that she sought the restraining order for a "strategic purpose other than seeking immediate protection of the court." Affirmed.

## OVERVIEW

As noted, Hurtado and Ishinabe lived together for 14 about years. They were "married" in 2006 in Japan and, as also noted, had twins together. Hurtado and Ishinabe are both admitted to practice law in California.

---

[1] All further statutory references are to the Family Code.

Hurtado in February 2014 filed a petition for dissolution of marriage. As noted, he subsequently dismissed that petition without prejudice and filed a petition to establish parental relationship, ostensibly because their marriage was not recognized in California.

The record shows Hurtado filed a written request on April 25, 2014 seeking among other relief an order that the twins attend preschool in English; that the twins not be taken outside California; that the twins' Japanese passports be given to Ishinabe's attorney pending further court order; that mediation through family court services be expedited; and that he be allowed custodial parenting time with the twins.

Hurtado's declaration in support of his April 25 request stated that he intended to move out of the family home, which was Ishinabe's separate property, by April 28, 2014; that he agreed to move voluntarily after Ishinabe had filed an unlawful detainer action against him; that he was a "stay-at-home dad taking care of [the] children, nurturing them, loving them, and insuring they have a clean [and] healthy living environment"; that his moving out would be "painful and confusing" for the twins; and that it was in the best interest of the twins for him to remain in close contact, but that Ishinabe had refused to even discuss the issue of visitation, had thwarted his efforts to reach some sort of settlement with her on the issue, including failing to show up at a family court services mediation (made in connection with his dissolution petition), and had made it clear that absent a court order, he could not visit the twins.

The record shows Hurtado and Ishinabe on April 25 entered into a stipulation approved by the court (stipulated order). It provided Hurtado would have visitation with

3

the twins from 3:00 to 7:00 p.m. twice during the week with "48 hours notice, subject to a 20[-]minute grace period for pick up," and from 3:00 to 7:00 p.m. on Saturday or Sunday under the same conditions. The stipulated order also required that the parties turn over the twins' passports to their respective attorneys, who would retain them pending further court order; and that all communications between the parties related to "sharing" of the twins would be by email. The stipulated order did not address whether Hurtado could also see the children in public.

As noted, Ishinabe on May 16, 2014 sought a temporary restraining order under the DVPA. She requested Hurtado stay 100 yards away from her, her home and the twins' school. In connection with her request for a restraining order, Ishinabe also sought an order that Hurtado attend a 52-week "Batterer Intervention Program" among other relief. Although Ishinabe requested the issuance of a restraining order, it appears she continued to abide by the stipulated order concerning Hurtado's visitation of the twins.

In any event, Ishinabe in her declaration in support of her request for a restraining order stated that Hurtado began "stalking" her on May 1, 2014, just after he had moved from the family home, when he showed up unannounced at the twins' preschool. Ishinabe went on to describe six other incidents, including one on Sunday, May 4, 2014 when Hurtado showed up at church at 7:30 a.m. Because she typically sang at the 7:30 a.m. service, but because she was sick that morning, Ishinabe stated she and the twins attended the 9:30 a.m. service. A church usher told Ishinabe that Hurtado had attended the earlier service. Because Hurtado had not attended that particular church in a year, his

4

decision to attend services that particular morning left Ishinabe feeling "puzzled and strange."

The May 4 day was also "visitation day." Ishinabe stated in her declaration that Hurtado arrived 10 minutes late with the twins and that instead of leaving after the drop off, he "lingered, causing the children to get nervous." Ishinabe stated that Hurtado then drove his car next to hers, making it unsafe for her to leave, and that she was "terrified" for her safety and for the safety of the twins.

Ishinabe in her declaration also described an incident that took place on May 11, 2014 when Hurtado again showed up announced at the 7:30 a.m. church service. On this occasion, Ishinabe was singing during the service. According to Ishinabe, Hurtado entered the church through a door typically not used by the public, sat down with the twins while she sang, and then walked the twins to her car after the service, where he proceeded to put the twins in their car seats after Ishinabe unlocked the car door. Ishinabe stated she was so "shaken" by this incident that she merely stood there, "frozen and could not say anything."

Ishinabe described incidents on May 13 and 14, 2014, when Hurtado showed up at the twins' preschool. During the May 13 incident, Hurtado walked the children to the preschool. During the May 14 incident, Ishinabe stated Hurtado parked his car in front of hers, leaving her no room to move her car. As a result of the May 14 incident, and as a result of Hurtado also showing up at the twins' school on May 15[2] and May 16, 2014,

---

[2]      Ishinabe noted the twins' school was closed on May 15 due to wildfires, and she was informed by the school that Hurtado had been at the school that morning.

Ishinabe filed the request for a restraining order.  The record shows the court granted a temporary restraining order and set a hearing for a permanent restraining order.

The trial court heard testimony on June 27 and July 14, 2014 in connection with Ishinabe's request for a permanent restraining order.  Ishinabe argued Hurtado had violated the temporary restraining order on two separate occasions, once in a grocery store parking lot on an "exchange day"[3] and another time in a downtown parking lot shortly before a court hearing involving this case.

During cross-examination, Hurtado testified that he showed up at the twins' preschool on May 1, 2014 out of concern for the twins, noting the day before (ostensibly during his visitation) the twins had cried for as much as two hours before, and when it was time for, their drop off with Ishinabe, as they wanted to remain with him.  Hurtado stated he therefore went to the twins' school on May 1 to make sure the twins were "all right."  Because he wanted to avoid causing them any additional trauma, Hurtado testified he stayed in his car that morning with the windows rolled up so the twins would not see him.

Regarding the May 4 incident, Hurtado testified that he went to the 7:30 a.m. church service to see the twins; that he attended that particular church for over 10 years until he took about a six-month absence and began attending another church each week; and that before attending the 7:30 a.m. service on May 4, he sought the advice of counsel.

---

3    Although Ishinabe was seeking a *permanent* restraining order against Hurtado, the record clearly shows she nonetheless continued to comply with the stipulated order concerning Hurtado's visitation with the twins, which required her to meet Hurtado at least six times a week (i.e., for drop off and pick up three days per week).

6

Hurtado was next questioned about the May 11 incident, which again took place at the church. Hurtado testified it was "Mother's Day" and he went to the church with flowers, which he then gave to the twins for them to present to Ishinabe. Hurtado also testified he went to the twins' preschool on May 13 only to see the twins and not Ishinabe. Hurtado noted that Ishinabe looked "upset" when he approached her car that day, but that she was "always" upset with him.

Hurtado denied receiving from his attorney an email sent by Ishinabe's attorney on May 13 stating that if Hurtado's "conduct" continued, Ishinabe would seek a domestic violence restraining order. Hurtado testified he later learned his attorney had in fact received such an email but that his attorney had forwarded it to the wrong email address. During closing argument, Hurtado's attorney confirmed that he had in fact forwarded the email to the wrong email address.

Hurtado testified on May 14 he again showed up at the twins' school. This time Ishinabe told him he was not supposed to be at the school. Hurtado testified he told Ishinabe in response it was "neutral territory" and thus he had a right to be at their school, as his attorney advised, even though it was not during his scheduled visitation time. Hurtado testified it was important for him to see his children off in the morning, before school, and "wish them a good day," and to see them in church, as he wanted them to understand the teachings of the church. Hurtado testified after they dropped the children off at school on May 14, he took photographs of his car and of Ishinabe's car because she had parked her car outside the school parking lot, which made him "suspicious." Hurtado

7

also admitted to showing up at the school on May 16, again to see the children and walk them to school.

Hurtado was also questioned about the two incidents after the temporary restraining order issued. Regarding the first incident that allegedly took place on May 27, 2014, Hurtado testified that he may have been at a shopping center in Tierrasanta; that the shopping center was close to his new home; that he and Ishinabe used to frequent that shopping center together; and that after he moved out of the family home he continued to shop there for groceries and frequent other businesses in the center, including a popular coffee shop and his bank. If in fact he was there at the same time as Ishinabe, as she contended, Hurtado testified it was purely a coincidence.

Regarding the second incident, Hurtado testified on June 3, 2014 he parked in a garage in a building in downtown San Diego and went to see his attorney in preparation for a court hearing that same day. Hurtado testified he was not aware that he had parked a few spaces away from where Ishinabe had parked her car, nor was he aware that she was still in her car at the time.

Ishinabe testified at the continued hearing that Hurtado began following or "stalking" her on May 1, 2014; that she first told Hurtado on May 11 when she saw him at church that he "shouldn't be there," although she admitted she "didn't say much" then to Hurtado because she did not want to get him upset; and that before he moved out of the family home, Hurtado frequently would use his telephone to record or "tape" her and the children, even after she asked him to stop.

8

Regarding the May 27 incident at the shopping center, Ishinabe testified that it was a "visitation day"; that Hurtado arrived about 10 minutes late; and that about 10 or 15 minutes after the drop off, she saw Hurtado slowly drive by in his car, which she stated left her "stunned." According to Ishinabe, she became "very scared" when Hurtado drove by and "stared" at her. Regarding the June 3 incident, Ishinabe stated she was "shocked" when Hurtado parked his car a few spots away from her car, even though there were plenty of other parking spaces. Ishinabe stated she parked in the garage in this particular building because she had an office there and because there was a court hearing that day regarding this case.

As a result of these two incidents and the incidents between May 1 and May 16, 2014, described *ante*, Ishinabe testified she feared for her safety because Hurtado was "harass[ing]" and "stalk[ing]" her.

On cross-examination, Ishinabe admitted (albeit reluctantly, as discussed *post*) Hurtado in the past used his cell phone to record her when she was speaking in Japanese to the twins because Hurtado could not understand what she was saying. Ishinabe also admitted Hurtado told her he was recording the children crying because Ishinabe was making them cry, although Ishinabe stated Hurtado was "making that up."

Regarding the incidents at the twins' preschool, Ishinabe testified that Hurtado used to drop them off at the school; that regarding the May 4 incident at the church, she was "puzzled" and "troubled" when she heard he was at the church for the 7:30 service

9

because he allegedly had not been going to that church for a year; and that on May 4, Hurtado had a right to visit with the children but not at 7:30 a.m.

Regarding the visitation later that same day, Ishinabe admitted that the parties stipulated to a "15-minute window" for drop offs, and that Hurtado was only 10 minutes "late"; that this was only the twins' second visit after Hurtado had moved from the family home; and that it was very difficult to get them from his car to her car because the twins were resisting and crying. When asked in connection with the May 4 afternoon incident if the twins were having difficulty adjusting to the fact that they had to leave one parent to go to another parent, Ishinabe stated, "On that day the children were doing fine. . . . Doing just fine. I don't know what happened during the visitation." When again confronted with the fact the twins may have been experiencing some difficulties in leaving their father after a visit, Ishinabe stated, "I suppose they were confused as to the situation," but later added "[t]hey seem to have understood they have to go to their father's place and come back to my place and so forth."

Regarding the May 11 incident, Ishinabe admitted it was Mother's Day and Hurtado showed up at the 7:30 a.m. service with flowers. However, she testified she could not "recall" whether Hurtado gave the flowers to the twins and when asked if the twins gave her the flowers, she stated, "[t]hey were holding flowers." Ishinabe also stated just Hurtado's presence made her "uncomfortable."

Regarding the May 13 incident at the twins' preschool, Ishinabe testified she feared for her "physical safety." When asked if Hurtado had ever struck or pushed her,

10

Ishinabe said "yes," but then added it "wasn't like he left a bruise or things like that." On further questioning, Ishinabe admitted that she did not call the police for "just one pushing" and that she did not include this incident in her declaration in support of the restraining order because it took place "a long time ago."

The record shows Ishinabe then quickly changed her testimony and stated the "pushing" incident was "not a long time ago," but instead was about a "month before he [i.e., Hurtado] moved out." Because it did not leave a bruise, Ishinabe testified she did not think to mention it in her declaration. Ishinabe then testified the one incident involved Hurtado "squeeze[ing her] wrist very hard," as opposed to "just one pushing," and that this incident allegedly took place when Hurtado tried to stop her from taking the twins to their preschool, or "something like that." Ishinabe testified she feared for her physical safety as a result of the May 13 incident (but not because of the pushing or squeezing) because she felt Hurtado was following her.

The record shows Ishinabe was cross-examined regarding her statement that Hurtado on May 14 parked his car in front of hers in such a way that she was unable to leave in her car. When shown photographs taken by Hurtado that day, Ishinabe testified that she could identify her car, but remarkably not Hurtado's, and that she could "not remember" whether a car was parked behind her that prevented her from moving. When one of the photographs showed Ishinabe had ample room to leave in her car, she testified Hurtado actually parked much closer to her car than shown in the photograph.

11

When asked about the May 15 incident, Ishinabe admitted the school was closed because of wildfires. After providing further testimony, the record shows the court sua sponte interjected with the following observation:

"The Court: I would like to note for the record it appears that Ms. Ishinable [*sic*] is reading from her declaration. Ms. Ishinable, [*sic*] I ask you to take the declaration, turn it face down and try to answer the questions [that] are being asked as opposed to reading from the declaration. Thank you."

Later during her cross-examination, Ishinabe testified that when Hurtado moved out of the family home he never expressed any intent to move back into the home or to start dating Ishinabe. In addition, she testified Hurtado never left any messages for her, including at her home or on her car. In fact, Ishinabe admitted that Hurtado never expressed any intent to see her in "some way."

Also during cross-examination, Ishinabe was asked if Hurtado expressed his view that 12 hours per week was insufficient to spend with the twins and that he wanted to spend more time with them. Initially Ishinabe testified, "I don't know if he said that," and when asked, "Did he [i.e., Hurtado] tell you that he felt that 12 hours was too little a time to be with his children?" Ishinabe stated, "What was the question?" When again asked the same question, she next responded, "Okay. Sorry. Ask me the question again." The record shows when asked this same question yet again, Ishinabe said, "Yes," but then when asked whether she and Hurtado tried to work something out to address his concerns, she responded, "I don't understand what you mean by that."

12

On redirect, Ishinabe testified Hurtado's presence at the twins' preschool made her apprehensive and fear for her physical safety because it was "not his visitation date. It made me worried. I felt he was desperate. That he could show up anywhere. He could show up at my house. I was very afraid."

Finally, the record shows Hurtado on direct examination testified that when he showed up at the twins' preschool, he was not looking for or following Ishinabe but instead was there for the twins; that Ishinabe did not tell him not to come nor did she tell him to leave; that in fact at one point he specifically asked Ishinabe if she thought it was " 'wrong' " for him to be at the school, but that she said nothing in response; that he believed he had an absolute right to go the preschool because that is where his children went to school; and that he had a similar right to attend the church services on May 4 and May 11.

Hurtado also denied ever squeezing Ishinabe's wrist and testified he never threatened to hurt or harm Ishinabe. He also testified that during the May 14 incident at the school, he parked his car approximately three to four car lengths away from where Ishinabe's car was parked, and that there was no car parked behind her. As such, he testified Ishinabe had "plenty of space" to move her car that day, despite her declaration and testimony otherwise, a fact which the photographs that were admitted into evidence seemed to confirm.

Later on cross-examination, Hurtado was asked if he had any understanding as to why Ishinabe was made to feel "uncomfortable" by his conduct. In response, Hurtado

testified, "No, sir, I don't. I know what she is claiming here. I don't believe that is true. I believe that what she is doing is trying to control the situation so she can keep me from having my fair share of custody with the babies. That's what she is doing."

After hearing argument of counsel, the court denied the permanent restraining order. In so doing, the court found in part as follows:

"I note that when the domestic violence temporary restraining order was requested, there was a declaration filed [by] Ms. Ishinable [*sic*]. Her declaration was filed. In that declaration she refers to the May 14 incident as being [in] a near constant state of anxiety and filing the restraining order to protect herself.

"She refers to the May 13th incident as fear [for] her physical safety because Mr. Hurtado's conduct escalated over the past two weeks. She refers to the May 11th incident as shaken, stood frozen, could not talk. She refers to the May 4th incident as terrified [for] her safety and [the] safety of the children.

"She again [in] . . . her declaration says she is in a near constant state of anxiety and fear when he might appear unexpected and accost her. I know during the same period of time there was a stipulated child custody and visitation agreement between the parties and she was dong regular exchanges with [Hurtado] six times per week unsupervised and did not express such fears she [was] unable to be in his presence for exchanges.

"I note there's no prior history of abuse, physical, mental or emotional in this case except for today for the first time ever . . . apparently for the first time her lawyer ever

14

heard about it she begins to say there was a hard wrist grab. At first begins to say it happened a long time ago. Then she changed to . . . say it happened relatively soon within a month of him moving out. It's interesting the manner in which she filled that fact in today.

"Other than that, there has been no prior mention or even alluding to prior history of abuse, physical or mental or emotional, verbal abuse of any kind which would then lay the basis for her to have a fear. There's a recent separation. Short period of time transition been going on here.

"She points to seven incidents but in fact only three of those incidents had any actual contact between the two of them. One is the May 11th at the church. One is the May 13th at the school. The other is the May 14th at the school. The other four incidents were not contact incidents.

"She learns through hearsay that he was at the church on May 4th and at the school on May 15th and 16th. She saw his car in the area of the school on May 1st. I would note that this is a short period of time, less than two weeks. It has not repeated. This is looking into a pattern now not requiring continued behavior. This is over [a] two-week period.

"I would note over two months now in the past and no incident. They have been without incident. All the incidents related to [Hurtado] seeing the children in a public place either at school or at church. At no time has there been any evidence presented

15

there were any threat at any time toward her safety and the focus was always on the children.

"I also note that on April 25th, 2014, there's the stipulation regarding the child custody and visitation order which I believe [Ishinabe's attorney] had the court take judicial notice of.  The child custody and visitation order stipulated is not a domestic violence restraining order.  Nowhere in there did it specifically prohibit the father from seeing the kid[s] at school, the children at school or church.  These are open public places.  If the children [were] involved in T-ball games or school plays, certainly the father could have attended.  Nothing in that child custody visitation order prohibited father from going to a T-ball game that these children [were] involved in or school plays whether or not it was during his custody time.

"He had no reason to think he is prohibited from being in those public places.  He showed up at the school three times when the children were with the mother and interacted with the children two times.  It is clear from the testimony, even the testimony of Ms. Ishinable, [*sic*] the focus was on the children, not the mother.  He showed up twice when no one was present and the school was closed.  He showed up at the church two times.  One time when the mother was there with the children.  The focus again was on the children.  The interaction was with the kids.

"The only exception of that and the only thing even begins to rise as the focus on the mother is that he brought the children flowers to give to their mother on Mother's Day.  There was no threats, verbal or situational threats in any of these situations.

16

"Mother, based on these incidents as described by the father, files a domestic violence temporary restraining order and a declaration under oath claiming that she's terrified. Terrified is what she claims under oath. But even though she is claiming she was terrified, she also at the same time admits she gave notice that if his conduct doesn't stop, then she will file a DV/TRO.

"This is interesting because it's conditional. She on the one hand wants the court to believe she is terrified. She needs the court's protection from Mr. Hurtado. But at the same time also saying, 'I let him know that if he didn't stop, then I [will] be seeking the TRO.' That's not how domestic violence restraining order represents.

"DV/TRO is when someone is truly terrified. As she claimed under oath to be if she needs protection of the court and she seeks the protection of the court. Instead, what she did in this case and what is clear to the court what she did in this case is she decided to file domestic violence temporary restraining orders for a *strategic purpose* other than seeking immediate protection of the court.

"He was engaging in conduct that she didn't want him engaging in and that she indicated, that 'if you don't stop, then I will file the DV/TRO.' That's a conditional. It shows at best conditional fear. But it actually shows other than that. It shows an improper use of the DV/TRO. If she was afraid, she would have gotten the DV/TRO. She would have her attorney file it and wouldn't have waited until after notice to the other party.

17

"She contacted her attorney to give notice to the other party's attorney. If it does not stop [she will] file the DV/TRO. Again this is an attempt to use the DV as a strategy and a legal device, not for someone who is . . . terrified as she claims she was.

"For all the reasons stated above, the mother's claim of fear is not reasonable based on the facts. And the circumstances and the history of this case as presented, the court does not find the mother credible in her declaration. She is less than forth[]coming with the court as to her level of fear in [her] declaration and DV/TRO." (Italics added.)

Next, the court addressed whether Ishinabe established a violation such that a restraining order was proper for "disturbing her peace," although the court noted Ishinabe in her declaration relied on fear, *not* disturbing the peace, as the basis for such an order. The court noted it was again back to its "concern regarding her credibility." The court ruled the facts did not support such a claim, finding in part on this issue as follows:

"Clearly the mother was annoyed the father was doing things that she didn't want him doing. But is there a credible reasonable and offensive conduct that rise to the level of her peace being disturbed to support the issuance of a restraining order[?] The court does not feel it does.

"The conduct as discussed was not designed to be offensive towards the mother such it was reasonable to her peace being disturbed. This is short term very minor, very minimal contacts. Again, three contacts over a period of less than -- in fact, actual contacts occurred over a period of four days. Total stated basis occurred over a period of

18

two weeks with seven incidents, three of which had contact and then stopped. This is the transitional period. The court needs to keep that in mind too in looking what is going on.

"There is a transitional period. The parties separated. Father moved out. They reached an agreement for child custody visitation. The father selfishly acknowledges as the court realizes selfishly wants to see the children. He is going through a period of withdrawal, is not seeing his children as often as he wants to and [as] often as he had so he finds places he can see them in public. Going by the school in the morning. Going by church.

"This does not rise -- these minimal few incidents focused on the children conducted in public locations does not rise to the level of her peace disturbed with offensive conduct that give the basis for the court to issue a restraining order even for that fact.

"The court does not find the conduct such that it rises to the level that it would disturb her peace within the meaning of [section] 6320. And as such, Ms. Ishinable [*sic*] has not met her burden of proof to satisfy the issuance of a restraining order.

"I want to note the two claims of violations of the [temporary] restraining order since it was issued and served on Mr. Hurtado on May 21st. The May 27th inciden[t] was murky and presented in different ways and times. The allegations he drove slowly . . . in the parking lot, shopping center, which is in the father's neighborhood he regularly shops and exchanges occurred.

19

"Today the information included it was 10 to 15 minutes after exchange. No contact. No threat. And frankly, the court doesn't find such an incidental occurrence to be a violation of the restraining order.

"The court is more concerned about the June 3rd incident. They both happened to park in the [same] building. Her because she claims her office is [there]. Him because that's where his attorney's office is. On their way to court for [a] court hearing on June 3rd, there's inadvertent close parking. No contact. No verbal exchanges. No threats. It didn't directly relate to an appearance. [¶] . . . [¶]

"[Hurtado's lawyer] claims that Mr. Hurtado believes she no longer had an office there and [was] getting only mail there. The court find[s] it as such an insignificant event not to rise to [the] level of [a] restraining order. Not finding she sustained her burden of proof, the court den[ies] the restraining order."

The record shows the parties and the court next discussed a modification to the child custody and visitation order between Ishinabe and Hurtado to clarify Hurtado could go to the preschool for a "special event," such as a "school play" or a "teacher meeting," as opposed to making an "unexpected appearance at the start and stop of school." The record shows counsel for Ishinabe and Hurtado agreed on behalf of their clients to such a modification.

DISCUSSION

A. *Guiding Principles*

At the time Ishinabe sought a restraining order, the DVPA authorized a trial court

20

"to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" if evidence showed "reasonable proof of a past act or acts of abuse." (Former § 6300.)[4] A court may issue an order enjoining specific acts of "abuse" (§ 6218, subd. (a)), which are defined as, among other things, behavior that could be enjoined under section 6320. (Former § 6203, subd. (d).) Section 6320, in turn, permits a court to enjoin a party from engaging in various types of behavior, including "disturbing the peace of the other party." (§ 6320, subd. (a).) "[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.)

We review an order granting or denying a protective order under the DVPA for abuse of discretion. (See *In re Marriage of Nadkarni*, *supra*, 173 Cal.App.4th at p. 1495.) In considering the evidence supporting such an order, "the reviewing court must apply the 'substantial evidence standard of review,' meaning ' "whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted," supporting the trial court's finding. [Citation.] "We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every

---

4       We note portions of the DVPA were amended effective January 1, 2015. (Stats. 2014, ch. 635, § 4.) Some provisions remain unchanged, and the changes that did go into effect do not alter our analysis of the issues in this case. But in the interest of clarity, our citation to sections of the DVPA are to the version in effect during proceedings in the trial court, except when otherwise noted.

21

conflict in favor of the judgment." ' [Citation.]" (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.) However, the weight to give the evidence and the power to judge the credibility of witnesses are matters exclusively reserved to the trial court as trier of fact. (*In re Arturo D.* (2002) 27 Cal.4th 60, 77.)

B. *Analysis*

As noted, Ishinabe contends the trial court erred because rather than determining whether she had shown reasonable proof of past acts of abuse as defined under the DVPA, the court instead based its denial on factors not required by the DVPA, including inter alia: (1) she did not demonstrate fear of future physical abuse; (2) Hurtado's focus was on the children and thus he did not *intend* to disturb her peace; and (3) the lack of any history of domestic violence between Ishinabe and Hurtado and the lack of any reoccurrence of any of the acts (after May 16, 2014) alleged by Ishinabe to constitute "abuse" for purposes of the DVPA.

We disagree with Ishinabe's basic premise that in denying her request for a permanent restraining order the court applied various requirements or factors not required under the DVPA—including the three mentioned above. Instead, the record shows the court looked to the evidence, *or lack thereof*, in connection with these and other factors when it found her less than credible as a witness and found she filed the request for restraining order for "strategic" reasons and as a "legal device." That is, the record shows the court found the evidence Ishinabe proffered—both by way of declaration and by her testimony—insufficient to sustain her burden to show "reasonable proof of a past act or

22

acts of abuse" (see § 6300), as defined under former sections 6203 and 6320.  We conclude that the record amply supports the trial court's findings and thus, that it did not abuse its discretion when it denied her request for a permanent restraining order.

As summarized *ante*—at the same time Ishinabe was claiming in her declaration that she was "terrified" for her safety *and* for the safety of the twins after the May 4 exchange of the twins in which she claimed Hurtado "lingered" in the shopping center parking lot; *or* that she was "shaken" and stood "frozen" and speechless on May 11 after Hurtado appeared at the 7:30 church service and afterwards, walked the twins to her car and had the audacity to put them in their car seats; *or* that she "feared for [her] physical safety" on May 13, after Hurtado approached her car in the morning when Ishinabe was dropping off the twins at their preschool—Ishinabe nonetheless was not so "terrified," "shaken" or "fear[ful]" that she was unable to meet Hurtado at least six times each week—over about a two-month period[5]—in order to drop off and pick up the twins per the stipulated order concerning Hurtado's visitation with the twins.

What's more, the record shows Ishinabe in her request for protective order requested that Hurtado attend a 52-week batterer intervention program, but, for whatever reason, she failed to include in her declaration in support of the restraining order that

---

[5]    The record shows the parties were complying with the April 25 child custody and visitation order at least by May 1, when Hurtado testified he went to the school to check on the twins because they had cried the day before when it was time to leave.  In addition, there is no evidence in the record the parties were not complying with the order at the time of the July 14, 2014 hearing, when the court denied Ishinabe's request for a permanent protective order.

Hurtado allegedly had pushed her once, as she initially testified, which testimony she immediately changed when she claimed Hurtado instead had squeezed her wrist hard.

The record also shows Ishinabe provided inconsistent testimony regarding when this one incident of physical abuse allegedly occurred. She initially testified it occurred a long time ago and left no bruises, which, she explained, was why she did not include this incident in her *detailed* declaration in support of the restraining order. Yet, the record shows Ishinabe again changed her testimony and said the incident occurred about a month before Hurtado moved out (i.e., March 2014). In either case, it appears entirely inconsistent for Ishinabe to omit this evidence from her declaration while at the same time seeking a court order restraining Hurtado *and* requesting he undergo a *year-long* batterer intervention program.

That there also is evidence in the record that, if credited, may have supported the issuance of a restraining order is not the test, as Ishinabe appears to contend on appeal. (See *Burquet v. Brumbaugh*, *supra*, 223 Cal.App.4th at p. 1143.) As noted, we review an order granting or denying a protective order under the DVPA for abuse of discretion (see *In re Marriage of Nadkarni*, *supra*, 173 Cal.App.4th at p. 1495) and in considering the evidence supporting such an order, we apply a substantial evidence standard of review (see *Burquet v. Brumbaugh*, *supra*, at p. 1143). Under the latter standard of review, we must look to the entire record and determine whether there is any substantial evidence, *contradicted or uncontradicted*, to support the court's finding. (*Ibid.*)

We conclude the court properly exercised its discretion when it found Ishinabe did not file her restraining order request for protection from "abuse" by Hurtado (see former §§ 6203 & 6320), as she contended, but rather for strategic reasons.  (See, e.g., § 3044, subd. (a) [creating a presumption against awarding sole or joint physical custody to a party who the court has found "perpetuated domestic violence against the other party seeking custody of the child . . . within the previous five years"].)[6]  We further conclude that these findings are supported by substantial evidence in the record[7] and that the court therefore properly denied her request for a permanent restraining order.

---

[6]     The full text of subdivision (a) of section 3044 provides: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Section 3011.  This presumption may only be rebutted by a preponderance of the evidence."

[7]     Although our review here is for abuse of discretion and substantial evidence, we note from our own review of the record there are multiple instances where Ishinabe claimed she did not understand, or was unable to respond to, even *simple* questions posed by counsel.  By way of example only, when Ishinabe claimed she did not report the one instance of physical abuse allegedly committed by Hurtado because it did not leave a bruise, Hurtado's counsel asked, "You [i.e., Ishinabe] understand that he [i.e., Hurtado] doesn't have to leave a bruise for you to report to the police physical injury?"  After her counsel's objection was overruled, Hurtado's counsel again asked the same question.  Ishinabe in response stated, "Do I understand?"  When Hurtado's counsel confirmed this was the question pending, Ishinabe then stated, "I don't think I understand the question.  Can you rephrase that, please?"  When Hurtado's counsel again asked the same question, Ishinabe finally responded, "I wouldn't call the police for just one pushing."  We note there are several other similar instances in the record bearing on Ishinabe's credibility, or lack thereof, including when the court sua sponte instructed her to stop reading from her declaration in support of the restraining order.

25

DISPOSITION

The order denying Ishinabe's request for a permanent restraining order is affirmed. Hurtado to recover his costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.